## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

                        **Case No. 1:20-cr-61**

    **v.**                      **JUDGE DOUGLAS R. COLE**

**JASON MINCY,**

    **Defendant.**

## OPINION AND ORDER

This cause comes before the Court on Defendant Jason Mincy's Motion to Suppress (Doc. 22), Motion to Dismiss the Superseding Indictment (Doc. 43), and Motion to Dismiss for Destruction of Evidence (Doc. 44). For the reasons discussed below, the Court **DENIES** all three motions.

## BACKGROUND

On February 12, 2020, Hamilton County Probation Officers Brandon Mossberger and Nick Kern patrolled their Over-the-Rhine ("OTR") beat, an area the Cincinnati Police Department ("CPD") calls "District 1," in an unmarked police car. (Doc. 50, #173–76). While driving along Republic Street, Mossberger recognized Jason Eugene Mincy, someone Mossberger knew from previous interactions going back to 2012. (*Id.* at #174–79). Indeed, on one prior occasion in 2019, Mossberger had attempted to arrest Mincy, but Mincy escaped. (*Id.* at #181). So, upon seeing him February 12, 2020, Mossberger asserts that he knew in the moment that Mincy had multiple outstanding arrest warrants. (*Id.* at #179). In addition, Mossberger claims that just as his eyes caught Mincy that morning, Mincy engaged in what looked like

a hand-to-hand drug transaction. (*Id.* at #177). When Mossberger turned his vehicle to tail Mincy, Mincy broke into a run. (*Id.* at #182). Mossberger then exited his vehicle and chased Mincy on foot. (*Id.*). When Mossberger ordered Mincy to stop, Mincy continued running. (*Id.*). Mossberger tased him. That ended the chase. (*Id.*).

As Mossberger was chasing Mincy, Mossberger also called for backup. (*Id.* at #182–83). But neither when calling for backup, nor when CPD officers arrived on scene, did Mossberger mention he witnessed Mincy perform a drug transaction. (*Id.* at #189). After handcuffing Mincy, officers removed from Mincy's person a loaded gun, a bag of methamphetamine, and U.S. currency.[1] (*Id.* at #187). In addition, Mincy was carrying a small, closed, drawstring bag over one shoulder, with his right arm running through the drawstrings.[2] (*Id.*). After subduing and handcuffing Mincy and searching his person, Officer Kern cut the strings and removed the bag from Mincy's back. While standing beside Mincy, he twice opened the bag to look inside quickly. He then closed the bag and gave it to Cincinnati Police Officer Kisha Williams, another officer who had responded to the scene. Officer Williams carried the bag to the back of a police cruiser located 10–15 feet from where Mincy was handcuffed and seated on the sidewalk surrounded by about six officers and firefighters.[3] Once at the

---

[1] Officer Mossberger's hearing testimony does not reference recovering currency on Mincy's person. However, both parties seemingly agree that officers did indeed recover money from Mincy, and Mincy does not seek to exclude the currency. (Doc. 52, #332).

[2] Mincy refers to this container as a "book bag." (Doc. 52, #332). After viewing police body camera footage, though, the Court believes it is more accurately characterized as a drawstring bag. This distinction does not affect the Court's analysis.

[3] The hearing transcript does not reflect this, but the Court has observed police body camera footage confirming Officer Williams opened the bag in the back of a police cruiser.

cruiser, she opened and searched the bag. (Doc. 52, #332). Her body camera shows that, inside the bag, she discovered a box of plastic sandwich baggies, along with "a red straw, a small silver folding pocketknife; a blue lighter; cigars (in loose form, as well as in their original packaging); 'Dutch' foil wrappers that contained meth pills; lottery tickets; and a crushed water bottle." (*Id.*; Doc 46-1, #136).

What happened next is less clear. Officers transported Mincy back to "District 1," which presumably refers to the CPD headquarters in the OTR District, but also could refer to a nearby Hamilton Country Sheriff's Office facility also called District 1. (Doc. 50, #197). Then, either at "District 1," or at the Hamilton County Jail where Mincy was ultimately detained (the evidence was unclear on this point), or both, officers searched Mincy's drawstring bag again. (*Id.* at #206). Cincinnati Police Officer Lauderman performed at least one of those searches (and perhaps the only one that occurred; as noted, the evidence was unclear on this point). (*Id.*). The government claims that Officer Lauderman's search was an inventory search. (Doc. 46, #125; Doc. 52, #332). That said, it is also not clear from the record whether Officer Lauderman conducted the "inventory search" under Cincinnati Police Department inventory-search policies, or Hamilton County Sheriff's Office inventory-search policies, or both. That is largely because Officer Matthew Martin, the only officer who the government presented to testify about that search at the hearing, did not assist in the alleged inventory search and was not present for it. Perhaps reflecting his lack of personal involvement, his testimony was less than clear. He originally stated that Officer Lauderman's search followed Cincinnati Police procedures. (Doc. 50, #204).

Later, though, Martin testified that the search followed Hamilton County Sheriff's Office intake procedures (presumably a reference to intake at the Hamilton County Jail). (*Id.* at #287–88). Of course, it is also possible, as noted above, that officers conducted multiple inventory searches—e.g., on the way to the police station, during booking at the police station, and again upon intake at the jail. If so, however, no one testified to that. Further adding to the confusion, the government introduced neither the CPD's nor the County Sheriff's written inventory-search procedures as evidence at the hearing, nor did the government offer any testimony about the substance of those procedures.[4]

Putting aside for the moment which procedures governed, or what those procedures entail, it is clear that the officers who conducted the alleged inventory search of the drawstring bag kept the box of plastic sandwich baggies as potential evidence of Mincy's distribution activity. (Doc. 50, #203–04). (The parties seem to agree that drug sellers sometimes keep a supply of sandwich baggies to use as packaging for their sales. (*See* Doc. 52, #340). At some point, though, an undisclosed officer (it may have been Officer Lauderman, but, once again, there was no testimony on the issue) presumably determined that the other contents, e.g., the red straw, the

---

[4] In briefing, the government alleges it "submitted into evidence a copy of CPD's policies and procedures regarding inventorying evidence." (Doc. 53, #348). And at the hearing, the government purported to submit "Hamilton County Sheriff's Office … general order" containing its "policy and procedure regarding inmate property" as Exhibit 5. (Doc. 50, #291–92). However, the document the government submitted as "Government Exhibit 5" is the document also found at Doc. 46-3. This document does not include or explain any procedure for the intake processing of inventory. The Court cannot locate in the record any document detailing either CPD's or the Hamilton County Jail's policies for inventorying a detainee's personal property.

pocketknife, etc., were not evidence of a crime, and thus remained Mincy's personal property. (Doc. 50, #300).

Wherever the "inventory search" occurred, and whatever procedures governed, Mincy ended up at the Hamilton County Jail. We know this because jail employees logged the personal property items from Mincy's bag on a Hamilton County Sheriff's intake form and placed the items in storage. (Doc. 46-1, #136; Doc. 46, #125). As part of the intake procedures at the Hamilton County Jail, Mincy himself also signed the form that listed his property. In doing so, he acknowledged his understanding that the facility would not store his property for more than 30 days after his release, transfer, or discharge. (Doc. 46-1, #136).

Then on March 6, 2020, Mincy signed another release, this one specifically allowing his girlfriend to collect his personal property. (Doc. 46-2, #138). In signing that form, he again acknowledged that the jail would destroy his property within 30 days of his release, transfer, or discharge if not collected. (*Id*.). His girlfriend apparently never collected his belongings.

In connection with the present case, Mincy was transferred from the Hamilton County Jail into the custody of the United States Marshal's Service on July 13, 2020. (Doc. 46-2, #139). When no one collected Mincy's belongings, Hamilton County jail staff finally disposed of them roughly three months later on October 12, 2020 (Doc. 46-1, #137), well after the thirty-day period had elapsed.

At first, state prosecutors had indicted Mincy on drug distribution charges. (Doc. 22, #51–52). But on June 17, 2020, a federal grand jury indicted Mincy on three

charges (which is what led to the transfer in custody). (Doc. 1). These charges included: possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C), possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c), and possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (*Id.* at #1–2).

The parties started plea negotiations. But, on April 4, 2021, Mincy also moved to suppress any evidence recovered from his drawstring bag. (Doc. 22). He argued the warrantless search of his bag following his arrest violated the Fourth Amendment. (*Id.* at #50). Accordingly, he believed the Court should suppress any evidence about the contents of that bag at trial. (*Id.*). Once he filed his Motion, plea negotiations deteriorated. (Doc. 53, #350).

On January 5, 2022, prosecutors filed a Superseding Indictment against Mincy. The new indictment elevated Count 1 to charge Mincy with distributing five grams or more of methamphetamine, an amount triggering 21 U.S.C. § 841(b)(1)(B). (Doc. 35, #87). Accordingly, this new count increased Mincy's exposure on this charge from 0–20 years of incarceration (under the original indictment) to 5–40 years. (*Id.*). Mincy contends prosecutors filed the Superseding Indictment in retaliation for his Motion to Suppress. (Doc. 52, #342). Prosecutors say they filed the Superseding Indictment because plea negotiations broke down. (Doc. 53, #350).

Mincy then moved to dismiss the Superseding Indictment on two grounds. First, Mincy argued that federal prosecutors violated his Fifth Amendment due process rights by filing the Superseding Indictment to punish Mincy for attempting

to exercise his Fourth Amendment rights and suppress the drawstring bag's contents. (Doc. 43, #101). Separately, Mincy also moved to dismiss on the grounds that the government violated his Fourteenth Amendment due process rights by improperly destroying exculpatory evidence when state officials disposed of the contents of his drawstring bag. (Doc. 44, #112).

After full briefing on all three motions, the Court heard testimony on May 19, 2022, and again (at Mincy's request) on August 11, 2022. (Docs. 50, 51). At the close of the second hearing, Mincy requested an opportunity to file supplemental briefing, which the Court granted. (8/11/22 Min. Entry). The parties have now filed supplemental briefing, and all three Motions are ripe.

## LAW AND ANALYSIS

### A.   The Court Denies Mincy's Motion To Suppress The Evidence Obtained From His Drawstring Bag.

Mincy claims the search of his drawstring bag violated his Fourth Amendment rights. This is a close case. The government concedes it did not have a warrant to search that closed bag, but relies on two exceptions to the warrant requirement: a search-incident-to-arrest and an inventory search. As described below, the Court finds that the evidence supports the former exception, if barely. And thus, the Court need not consider the latter.

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. To protect this right, courts will suppress "evidence obtained in violation of the Fourth Amendment [from] be[ing] used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414

7

U.S. 338, 347 (1974). In most cases, Fourth Amendment rights are "preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985). When police officers arrest a suspect on foot, like Mincy, they have a right to search the suspect's pockets, and even open containers, e.g., wallets, that they find there. *United States v. Robinson*, 414 U.S. 218, 236 (1973). But arrestees retain a reasonable expectation of privacy as to the contents of any closed containers like briefcases, duffle bags, and purses that they may be carrying. *United States v. Chadwick*, 433 U.S. 1, 11 (1977), *abrogated on other grounds*, *California v. Acevedo*, 500 U.S. 565 (1991). Here, at least so far as the Court can tell, all agree that Mincy had such an expectation of privacy in his closed drawstring bag, and that Officer Williams lacked a warrant to search Mincy's bag.[5]

That is not the end of the story though. Even without a warrant, various exceptions exist that can make a search "reasonable," and thus permissible under the Fourth Amendment. And if officers observe contraband in plain view during the execution of a lawful (if warrantless) search, officers may seize the evidence at issue—here the sandwich baggies. *See United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011). Neither party disputes the applicability of the plain view doctrine. Instead, the only dispute is whether an exception applies. As noted, the government mainly

---

[5] As Officer Mossberger notes, Mincy had multiple warrants out for his arrest. (Doc. 50, #179). However, an arrest warrant is not carte blanche to search an arrestee's property. *See Steagald v. United States*, 451 U.S. 204, 212–213 (1981) (describing the differences in purpose behind an arrest warrant as opposed to a search warrant). Thus, the arrest warrants do not, in and of themselves, act as a warrant to search Mincy's drawstring bag.

8

asserts two such exceptions: (a) searches-incident-to-arrest, and (b) inventory searches.

Before turning to these exceptions, the Court detours briefly to discuss the burden of proof. As "[t]he proponent of a motion to suppress," Mincy "has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Evers*, 669 F.3d 645, 651 (6th Cir. 2012) (quoting *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011)). But to answer whether he has carried that burden, the Court "must begin 'with the basic rule that searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.'" *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). And, given that "basic rule," in a warrantless search, it is the government, not the defendant, that bears the burden of showing that an exception to the warrant requirement applies. *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

Against that backdrop, the government opens by arguing officers conducted a proper search-incident-to-arrest when they searched Mincy's closed drawstring bag. As a general matter, a search-incident-to-arrest allows officers to search those areas within the "arrestee's 'immediate control,'" understood to mean "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *Arizona v. Gant*, 556 U.S. 332, 335 (2009). At one time, it was clear that the "immediate control" question applied *as of the time of the arrest*, a standard that

9

traces back to the Supreme Court's decisions in *New York v. Belton*, 453 U.S. 454 (1981), and *Chimel v. California*, 395 U.S. 752, 762–63 (1969). That was evident in *Northrop v. Trippett*, where the Sixth Circuit observed:

> [T]he right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. *So long as the defendant had the item within his immediate control near the time of his arrest, the item remains subject to a search incident to arrest.*

265 F.3d 372, 379 (6th Cir. 2001) (emphasis added).

*Gant*, though, narrowed that exception. In particular, the Supreme Court held that once the police securely detain an arrestee, the justifications for the exception—officer safety or concerns the suspect may destroy evidence—cease, and any subsequent search is not reasonable. *See Gant*, 556 U.S. at 339. The Sixth Circuit has interpreted *Gant* to mean that a lawful search-incident-to-arrest extends to only two circumstances: "[1] if the arrestee was unrestrained and within reaching distance of the [area at issue] at the time of the search, or [2] if it was reasonable for the arresting officers to believe that evidence relevant to the crime of arrest might be found in the vehicle." *United States v. Buford,* 632 F.3d 264, 269 (6th Cir. 2011) (citing *Gant*, 556 U.S. at 351). And the latter appears to apply only in the vehicle context, which is not at issue here. *Gant*, 556 U.S. at 343.

Ultimately then, the question comes down to whether Mincy was both "unrestrained" and "within reaching distance" at the time the relevant search occurred. *Buford*, 632 F.3d at 269. As to the former, the mere fact that an arrestee is handcuffed does not necessarily mean he is entirely restrained. *United States v. Dillard*, 78 F. App'x 505, 512 (6th Cir. 2003). After all, even when handcuffed, a party

10

may be able to reach into a nearby bag. *See, e.g.*, *United States v. Ferebee*, 957 F.3d 406, 419 (4th Cir. 2020) (finding search valid where "[t]here [was] no impediment to Ferebee's movement beyond the handcuffs," and he was standing just feet away from the bag searched); *Cook*, 808 F.3d 1195, 1199–20 (9th Cir. 2015) (considering "significant, but not dispositive," that the suspect was handcuffed and facedown and finding search valid where it was in close spatial and temporal proximity to time of arrest). Rather, the relevant question strikes the Court as the interaction between those two factors. The more tightly "restrained" a suspect, the shorter the applicable "reaching distance."

Potentially confounding the situation here, at least two officers searched Mincy's bag at the time of his arrest. From the Court's review of the body camera footage, it appears Officer Kern briefly looked into the bag twice, and did so while standing directly next to Mincy and right after handcuffing him. Separately, Officer Williams examined the bag in more depth after carrying it to a nearby police cruiser.

The applicability of the search-incident-to-arrest exception, then, may depend on which of these searches is the relevant search. Unfortunately, though, the government is less than clear as to the search on which it is relying. In the government's original opposition to Mincy's Motion, the government pointed to Officer Kern's search. (Doc. 23, #56). In its post-hearing briefing, however, the government appeared to pivot to Officer Williams. (Doc. 53, #347). Given the confusion on this front, the Court opts to consider both.

Let's start with Officer Kern's search(es). Body camera footage shows that Officer Kern looked into the bag just after removing it from Mincy's back, and while standing directly next to him. Moreover, Officer Kern opened the bag in close temporal proximity to Mincy being detained. To be sure, Mincy was seated on the ground and handcuffed at the time of Kern's searches, and multiple officers were on scene. This makes it a close issue. But under the "lenient standard" that applies, the Court cannot say that Mincy would have been wholly unable to access the bag when and where Officer Kern searched it. *United States v. Shakir*, 616 F.3d 315, 319–21 (3d Cir. 2010). In other words, there was more than a "mere theoretical possibility" that Mincy could access the bag at that time. *Id.* Thus, notwithstanding that Mincy was cuffed and in the presence of other officers, the Court concludes that Officer Kern's search into the closed drawstring bag was a valid search-incident-to-arrest. And given how small the bag was, there can be no question that Officer Kern saw all of the bag's contents—including the box of sandwich baggies, the largest object in the bag—when he looked inside.

Given the cursory nature of Officer Kern's inspection, however, the Court separately considers whether Officer Williams' search was also a valid search-incident-to-arrest under *Gant*. After all, she performed a much more detailed search. The Court concludes that this latter search, though, is not valid under *Gant*. At the time Officer Williams conducted the search, Mincy was handcuffed, seated on the sidewalk, surrounded by officers, and about fifteen feet away from the police cruiser where the search occurred. There was no meaningful possibility under those

12

circumstances that Mincy could access the bag either to get a weapon or to destroy evidence. Thus, under *Gant*, that search was not a valid search-incident-to-arrest.

Ultimately, though, given the Court's conclusion about Officer Kern's search, the validity of Officer Williams' search under *Chimel/Gant* ends up largely irrelevant. That is because, under *Illinois v. Andreas*, 463 U.S. 765, 769–72 (1983), once Officer Kerns lawfully opened the bag and looked inside, Mincy lost his reasonable expectation of privacy as to any contents of that bag that were in plain view.

In short, the Court concludes that, while Officer Williams' search was not a valid search-incident-to-arrest under *Gant*, Officer Kern's was. As either search necessarily would have revealed the item of interest—the sandwich baggies—the Court concludes that suppression of that evidence is not warranted on the facts here. And, given that determination, the Court need not address the government's other arguments in opposition to the Motion.[6] Accordingly, the Court **DENIES** Mincy's Motion to Suppress (Doc. 22).

---

[6] That said, the Court notes that, on the record here, the government likely did not meet its burden to prove that Officer Lauderman's search of Mincy's bag was a valid inventory search. "In order to be deemed valid, an inventory search may not be undertaken for the purposes of investigation, and it must be conducted according to standard police procedures." *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012) (citing *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007)). In other words, an inventory search must be conducted in accordance with "standardized criteria," or "established routine." *United States v. Wells*, 495 U.S. 1, 4 (1997). Here, although Officer Matthew Martin testified that he believed Officer Lauderman conducted the search in compliance with standard policies and procedures, (Doc. 50, #203–04), the government never actually submitted any evidence as to the substance of those policies or procedures. Moreover, Officer Martin did not witness the supposed inventory search, and he apparently did not discuss with Officer Lauderman how or why the search occurred. (Doc. 51, #310–11). Indeed, the Court does not even know where the alleged inventory search occurred (i.e., at police headquarters, or during intake at the Hamilton County Jail, or both), or even which inventory-search policy (CPD or Hamilton County) applied. Martin's testimony on such issues was less than clear. (*Compare* Doc. 50, #204 (suggesting it was CPD policies), *with id.* at #287–88 (suggesting it was Hamilton County

**B.     The Court Denies Mincy's Motion To Dismiss The Superseding Indictment Due To Prosecutorial Vindictiveness.**

Separately, Mincy seeks dismissal of the Superseding Indictment on grounds that the federal prosecutors violated his Fifth Amendment rights by vindictively punishing him for exercising his constitutional rights. That is a difficult argument. A prosecutor has broad discretion in deciding whom to prosecute and how to prosecute. *United States v. LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013). That said, this discretion has limitations. *Id.* As most relevant here, "prosecutorial discretion is restrained by the Due Process Clause, which prohibits the prosecution from punishing a defendant for exercising a protected statutory or constitutional right." *Id.* (citing *United States v. Poole*, 407 F.3d 767, 774 (6th Cir. 2005)).

A defendant seeking dismissal of an indictment on these grounds must show either "actual vindictiveness" or a "realistic likelihood of vindictiveness." *Id.* Mincy claims the latter. (Doc. 52, #342–44). To succeed on that argument, Mincy "must establish that (1) the prosecutor has some stake in deterring the petitioner's exercise

---

policies)). The Court explicitly requested evidence on such topics at the outset of the hearing. (Doc. 50, #202). That is because meeting the inventory-search exception typically requires the government to submit actual evidence regarding the substance of the relevant inventory-search policy. *See United States v. Barraza-Maldonado*, 879 F. Supp. 2d 1022, 1033 (D. Minn. 2012), *aff'd*, 732 F.3d 865 (8th Cir. 2013); *Ex parte Boyd*, 542 So. 2d 1276, 1281 (Ala. 1989); *United States v. Jackson*, No. 1:07-CR-016, 2010 WL 148161, at \*4 (S.D. Ohio Jan. 11, 2010). It is unfortunate that the government failed to provide that evidence, as the Court imagines it at least plausible that standard inventory-search procedures exist, and that a search conducted pursuant to them here either did discover, or would have discovered (which likely would suffice under the inevitable-discovery doctrine), the contents of the drawstring bag. The Court's ability to imagine that possibility, however, does not substitute for evidence. And on the record actually before it, the Court doubts the government proved a valid inventory search occurred. (If the government submitted such procedures, and the Court overlooked them, the Court regrets the oversight.) In any event, it ends up mattering little. Because Officer Kern conducted a valid search-incident-to-arrest, the Court need not reach the inventory-search issue.

14

of his rights and (2) the prosecutor's conduct was somehow unreasonable." *Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001) (quoting *United States v. Anderson*, 923 F.2d 450, 453–54 (6th Cir. 1991)) (quotation marks omitted).

The Court starts and ends with the first element. Mincy seeks to meet this element by arguing his pretrial motion to suppress raised the stakes for the prosecution. (Doc. 52, #342–43). And indeed, a defendant's pursuit of pretrial motions to enforce constitutional rights can, in limited circumstances, create the "stake" necessary to support a prosecutorial vindictiveness claim. But routine pretrial motions do not suffice. *See United States v. Rosse*, 716 F. App'x 453, 462 (6th Cir. 2017); *United States v. Suarez*, 263 F.3d 468, 479–80 (6th Cir. 2001). This is because the burdens of such pretrial motions are "garden variety" or "rather minimal." *Rosse*, 716 F. App'x at 462; *Suarez*, 263 F.3d at 480. It is only pretrial motions that risk "eviscerating" the government's case which can give rise to a sufficient governmental "stake" to meet the first element. *United States v. LeDeau*, 734 F.3d 561, 567–69 (6th Cir. 2013). And "eviscerating" is a high standard; it is not met where success on the defendant's pretrial motion would simply make the prosecution "more of a chore." *Id.* Rather, it must make it "impossible." *Id.*

Here, Mincy argues prosecutors sought to punish him for exercising his Fourth Amendment rights by moving to suppress evidence. (Doc. 52, #342–43). Yet he has failed to show how this Motion created enough of a "stake" to allow the Court to infer prosecutors acted with vindictiveness in filing the Superseding Indictment. Simply put, Mincy's Motion to Suppress, even if successful, would not have "eviscerated" the

government's distribution case against him. When arrested, officers allegedly recovered some 17.235 grams of methamphetamine, along with a firearm and cash, from Mincy's person. (Doc. 46, #125). That evidence, even without the contents from his drawstring bag, easily could support an inference by the finder of fact that Mincy was more than a simple user, but instead trafficked in methamphetamine. In other words, Mincy's possession of plastic baggies alone can hardly be said to make or break the government's case. Therefore, Mincy's Motion to Suppress did not threaten to "eviscerate" the government's case; at most it creates "more of a chore." That is not enough. *LeDeau*, 734 F.3d at 569.

Mincy responds by citing to the testimony of his expert David Leff. (Doc. 52, #344). Leff opined that without the evidence of the plastic baggies found in the drawstring bag, he could not reach a conclusion to a professional degree of certainty whether Mincy possessed methamphetamine for his own personal use or for distribution. (Doc. 50, #240–41). In short, Mincy argues the government's distribution case hinges on the plastic baggies. Yet on cross-examination, Leff identified multiple variables that could offer circumstantial evidence of distribution, including drug quantity, drug packaging, drug paraphernalia, U.S. currency and its denomination breakdown, officer observations, the location of the events, etc. (*Id.* at #254–64). Many of these would still be available to support the government's distribution case, even in the absence of the sandwich baggies. And finally, Officer Mossberger testified at the hearing that he witnessed Mincy engage in a hand-to-hand drug transaction

16

before arresting him.[7] (*Id.* at #176; Doc. 46, #124). This direct evidence too offers, at a minimum, a foundation for arguing Mincy distributed methamphetamine.

In sum, Mincy cannot show that prosecutors acted with a "realistic likelihood of vindictiveness" because Mincy's Motion to Suppress was only a garden variety pretrial motion. Even without the plastic baggies, prosecutors still would have sufficient evidence to credibly present to the jury that Mincy distributed methamphetamine. Accordingly, the Court **DENIES** Mincy's Motion to Dismiss the Superseding Indictment (Doc. 43).

## C. The Court Denies Mincy's Motion To Dismiss The Superseding Indictment Due To The Destruction Of Evidence.

Finally, Mincy has failed to show that the government violated his Fourteen Amendment rights by improperly destroying the evidence in his drawstring bag. At the outset, the Court acknowledges that Mincy accuses CPD officers of failing to preserve evidence. (Doc. 44, #112). But the evidence in question appears to have made its way into the custody of Hamilton County. This is because the Hamilton County Sheriff's Office listed the evidence in a Property Record Receipt. (Doc. 46-1, #136).

---

[7] Officer Mossberger admits he, in the moment, did not tell his fellow officers about seeing Mincy engage in hand-to-hand drug transactions. (Doc. 50, #189–90). He instead says he notified Officer Lauderman later. (*Id.* at #197). But Mossberger also admits that he intended to arrest Mincy pursuant to outstanding arrest warrants. (*Id.* at #201). This may present something of an inconsistency. But to the extent that Mincy attacks as inconsistent Mossberger's testimony that he witnessed Mincy exchange drugs, that question goes to probity and Mossberger's credibility and not the admissibility of the evidence. Fed. R. Evid. 401; Fed. R. Evid. 402. Therefore, Mossberger's testimony can still bolster the prosecution's distribution case, further showing that success on the Motion to Suppress does not "eviscerate" the government's case.

Accordingly, if someone failed to preserve Mincy's evidence, Hamilton County Jail staff appear to be the culprits rather than CPD officers.

"Under the Due Process Clause of the Fourteenth Amendment, criminal defendants must be afforded 'a meaningful opportunity to present a complete defense.'" *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Accordingly, a defendant may seek to have his or her indictment dismissed where the government fails to preserve exculpatory evidence. *Collins*, 799 F.3d at 569. This argument can proceed in one of two ways. First, under *Trombetta*, dismissal is warranted where the evidence has apparent exculpatory value before its destruction, and the evidence is of a nature that the defendant cannot "obtain comparable evidence by other reasonably available means." 467 U.S. at 489. Second, under *Youngblood*, dismissal is warranted when the defendant demonstrates:

> (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Collins*, 799 F.3d at 569 (quoting *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996)).

Mincy argues that, under either standard, the government improperly failed to preserve the allegedly exculpatory evidence contained his bag (everything other than the plastic sandwich baggies). (Doc. 52, #336–41). In particular, he argues that the straw, knife, lighter, cigars, "Dutch" foil, lottery tickets, and crushed water bottle

18

all support his defense that he simply used drugs rather than trafficking them. (*Id.* at #337).

Conspicuously absent from Mincy's filings, though, is any discussion of *why* his evidence has disappeared. The record shows that, on February 12, 2020, and March 6, 2020, Mincy signed documents specifically acknowledging what would happen to those items if Mincy failed to have them collected within a certain time. (Doc. 46-1, #136; Doc. 46-2, #138). And on March 6 specifically, Mincy designated Keshae Henderson, his girlfriend, as the person to whom the jail may release his property. (Doc. 46-2, #138; Doc. 50, #289–90). At this point, these items had not been kept as evidence for trial, but instead remained Mincy's personal property. (Doc. 50, #291). In signing the inventory release form on February 12, Mincy "acknowledge[d] that any personal property and/or clothing stored for more than 30 days from release, transfer or discharge *will be destroyed, donated, or otherwise disposed of without court order as understood and agreed to by the prisoner*." (Doc. 46-1, #136 (emphasis added)). He agreed to that same language on the form that he signed on March 6, 2020. (Doc. 46-2, #138). His girlfriend, however, apparently never sought to collect the materials.

On July 13, 2020, the United States Marshal Service took custody of Mincy pursuant to this case, triggering the 30-day clock. (Doc. 46-2, #139). Thus, as the two signed forms provided would happen, jail staff disposed of Mincy's property some three months later on October 12, 2020. (Doc. 46-1, #137).

19

Moreover, Mincy was arraigned and notified of the federal distribution charge against him on July 13, 2020. (Doc. 7). That means he had, at minimum, the same three months' notice to ensure that someone collected his allegedly exculpatory property before its destruction. Plainly put, the Court concludes that, under either *Trombetta* or *Youngblood*, the government must in some manner unfairly impede the defendant's ability to access or collect exculpatory evidence.[8] A defendant cannot cry foul where, as here, the defendant himself knowingly and voluntarily permits the disposal of such evidence. Notwithstanding Mincy's incarceration, he acknowledged the jail would destroy his property if not collected. He has no grounds to retract that waiver now.[9] After all, both *Trombetta* and *Youngblood* stem from a body of constitutional law "loosely … called the area of constitutionally guaranteed *access* to evidence." *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988) (quoting *United States v.*

---

[8] This sentiment mirrors the required "bad faith" prong found in *Youngblood*. 488 U.S. 51, 57–58 (1988). However, the Court sees a deeper prerequisite at play here. For a defendant to prevail under either *Trombetta* or *Youngblood*, it appears the government necessarily must have prevented, either intentionally or negligently, the defendant from receiving or accessing the evidence at issue for use in his or her defense. That did not happen here—Mincy had every right and opportunity to have his belongings removed from the jail's custody. Had his girlfriend come to collect them, jail staff would have willingly handed them over. This does not strike the Court as the type of situation *Trombetta* or *Youngblood* envision. The negligence here, if any, was on the part of Mincy and/or his girlfriend, and it is unreasonable to make the government responsible for that negligence.

[9] In addition, the Court questions whether the evidence here is truly "exculpatory." Exculpatory evidence refers to evidence that "would raise a reasonable doubt about the defendant's guilt." *Trombetta*, 467 U.S. at 485 (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *United States v. Wershe*, No. 88–1666, 1990 WL 177203, at *5 (6th Cir. Nov. 14, 1990) ("This duty to preserve evidence is limited to evidence that is expected to play a significant role in the suspect's defense."). Mincy claims the evidence at issue would help prove that he is a drug user. But the Court sees nothing inconsistent about a person being both a user and a distributor. That combination occurs commonly. Thus, proving Mincy is a user would not appear to the Court to make it significantly less likely that he is a dealer. In fact, the contrary may be true.

*Valenzuela–Bernal*, 458 U.S. 858, 867 (1982)) (emphasis added). No party disputes that Mincy had access to the evidence here to make his defense; he simply elected not to take advantage of that access.

Separately, there is the matter of prejudice. When considering the appropriate response to claims of spoliation in the criminal context, the Court may consider how much the lack of the evidence at issue will prejudice the defendant. *Cf. United States v. Braswell*, 704 F. App'x 528, 536 (6th Cir. 2017) (noting that prejudice can be a relevant factor in determining the appropriate remedy for claims of spoliation). Here, Mincy claims that the missing evidence would help corroborate his claim that he is a user, rather than a dealer. But the government has offered to stipulate "that Mincy is a user and that the unpreserved items were consistent with both personal use and trafficking." (Doc. 53, #349). In other words, the government will *stipulate* to what Mincy hopes the jury may conclude from the evidence (that he is a user). The Court cannot see how, given that stipulation, Mincy could suffer prejudice here based on the loss of the evidence.

Mincy argues he is "prejudiced because he cannot examine and test the items that the government failed to preserve as evidence." (*Id.* at #356). But given the stipulation above, what additional benefit could examination and testing provide? Any evidence developed from examining and testing the materials would, at best, simply confirm that the evidence suggests Mincy is a user. But that is exactly what the government has offered to stipulate. In short, even assuming Hamilton County

jail staff improperly destroyed exculpatory evidence, Mincy will not be prejudiced by the destruction.[10]

For all these reasons, Mincy has failed to show that his Fourteenth Amendment rights have been violated by the destruction of exculpatory evidence. Accordingly, the Court **DENIES** Mincy's Motion to Dismiss for the Destruction of Evidence (Doc. 44).

## CONCLUSION

For the reasons discussed, the Court **DENIES** Mincy's Motion to Suppress (Doc. 22), **DENIES** Mincy's Motion to Dismiss the Superseding Indictment (Doc. 43), and **DENIES** Mincy's Motion to Dismiss for the Destruction of Evidence (Doc. 44).

**SO ORDERED.**

November 23, 2022
_____
**DATE**

_____
**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[10] The Court is not suggesting a per se rule that the government is free to destroy exculpatory evidence in a given case so long as the government is willing to stipulate to the evidence's contents. Rather, the point is merely that prejudice is something the Court can consider in appropriate circumstances.